IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRIS SZENTADORJANY,** | : | CIVIL ACTION NO. 3:18-CV-2215 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| **WAKEFERN FOOD CORP.,** *et al.*, | : | |
| | : | |
| Defendants | : | |

### **MEMORANDUM**

Plaintiff Chris Szentadorjany was injured at the end of his work shift in February 2017. After completing frozen food deliveries using a refrigerated tractor-trailer truck, Szentadorjany's legs became stuck under the trailer's rear roll-up door. Szentadorjany filed this lawsuit, asserting negligence and products-liability claims against three defendants: Whiting Door Manufacturing Corporation ("Whiting"), which manufactured the roll-up door; Wabash National Corporation ("Wabash"), which manufactured the trailer; and Wakefern Food Corp. ("Wakefern"), which owned the trailer. Through third- and fourth-party pleading, Northeast Fleet Services, Incorporated ("Northeast"), Ironclad Logistics, LLC ("Ironclad"), and Lily Transportation Corporation ("Lily") were joined to the action. All defendants have moved for summary judgment, either against Szentadorjany or against each other. We will grant in part and deny in part these motions.

I.      **Factual Background & Procedural History**[1]

   A.      **The Accident**

Szentadorjany worked as a licensed commercial driver, hauling and delivering frozen foods in a refrigerated trailer.[2] (See Doc. 70 ¶ 2). After finishing his deliveries for February 4, 2017, Szentadorjany returned to the Americold Logistics ("Americold") trailer depot in Gouldsboro, Pennsylvania. (See Doc. 66-2 ¶ 8; Doc. 70 ¶ 1). What happened next is vigorously disputed by all parties. According to Szentadorjany, he left his loading strap inside the trailer, and as he stepped into the trailer to retrieve it, the roll-up door began to come down toward him. (See Doc. 66-2 ¶ 16). He fell and became pinned underneath the door with the bottom of

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 66-2, 69-1, 70, 72, 74-2, 82, 83, 86, 90). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

[2] Szentadorjany agrees with Wakefern that he was employed by Ironclad. (See Doc. 70 ¶ 2; Doc. 86 ¶ 2). Despite this understanding, however, he does not deny Whiting's separate assertion that he was employed by "LTL, Incorporated." (See Doc. 66-2 ¶ 6; Doc. 90 ¶ 6). Adding to the confusion over the precise identity of plaintiff's employer, Lily claims Szentadorjany was engaged by Lily Transportation Corporation doing business as Ironclad Logistics LLC. (See Doc. 69-1 ¶ 1). Lily further claims it was improperly pled as two separate defendants, Ironclad and Lily. (See Doc. 69-1 at 1). Wakefern, Whiting, and Northeast all deny Lily employed Szentadorjany, and point to evidence of record that Szentadorjany's employer was either Ironclad or "LTL, Inc." (See Doc. 82 ¶ 1; see also Doc. 66-2 ¶ 6 n.1).

his legs hanging off the back of the trailer. (See id. ¶ 17). Szentadorjany used his cell phone to call general manager Anthony Lannak, and Lannak instructed onsite dispatcher Elliott Petrella to assist Szentadorjany. (See Doc. 77-3, Szentadorjany Dep. 226:12-227:12). Petrella found Szentadorjany in the following position and sent the photo to Lannak:



(See Doc. 66-2 ¶ 17). After unsuccessfully attempting to open the door with a crowbar, workers used a forklift to hold open the door and extricate Szentadorjany. (See Szentadorjany Dep. 290:18-291:16).

Szentadorjany exited the trailer "hobbling a little bit," but was able to walk. (See Doc. 79-11, Lannak Dep. 139:3-141:15; Doc. 90-8 at 2). He and Petrella then both filled out incident reports. (See Doc. 79-12). These reports categorized Szentadorjany's injury as "sprains/strains" involving the following body parts: forearms, upper arms, right shoulder, and neck. (See id. at 2, 4). Petrella's report

also noted that "corrective action" would include an inspection report of the trailer. (See id. at 3). Szentadorjany declined medical treatment on the day of the incident. (See id. at 2, 4). However, he sought medical attention the following day. (See Doc. Szentadorjany Dep. 267:9-268:14). Szentadorjany testified that he has ongoing neck, head, right shoulder, and arm pain due to the accident. (See id. at 165:21-24, 175:24-176:7, 253:17-255:16).

### B. Trailer Information

Whiting originally designed the roll-up door that pinned Szentadorjany. (See Doc. 74-2 ¶ 4). Similar to a garage door, these doors utilize a cable system on the left and right side to lift and lower the door, as shown by the example below:



Illustration 1 – Cable Attachment Assembly

(See Doc. 72 ¶ 4). As the photo illustrates, a clevis pin secures the cable to the door's bracket hardware, and a cotter key prevents the clevis pin from falling out. (See, e.g. Doc. 79-10 at 2). Whiting's door also came affixed with an exterior warning label, cautioning users, *inter alia*, of the following: "CHECK STRAP AND

4

CABLE DAILY FOR FRAYING," and "DO NOT STAND UNDER DOOR WHEN IT IS MOVING." (See Doc. 74-2 ¶ 7; Doc. 77-8 at 1).

Whiting delivered a custom order of its roll-up doors to Wabash for assembly and installation on trailers. (See Doc. 74-2 ¶¶ 2-3; Doc. 74-11 at 3; Doc. 74-12). Wabash installed the doors on a fleet of trailers that required Whiting overhead doors. (See Doc. 74-8 at 8-9). Wakefern took title to one such trailer in 2011, referred to as "trailer #2908," which is now the subject of the instant litigation. (See Doc. 70 ¶ 3; Doc. 74-18 at 2; Doc. 79-4). Wakefern contracted with Northeast to repair and maintain Wakefern's equipment and vehicles at the trailer depot where Szentadorjany's accident occurred. (See Doc. 70 ¶ 4; Doc. 79-5). Ironclad contracted with Americold, owner of the trailer depot, and agreed to provide "motor carrier services" to Americold and Wakefern. (See Doc. 69-8).

Trailer #2908 passed both annual and inbound inspections in the months leading up to the accident. (See Doc. 70 ¶¶ 5-6). On October 8, 2016, Northeast mechanics performed a semiannual inspection on trailer #2908 that met Federal Highway Administration ("FHWA") standards. (See Doc. 70 ¶ 5; Doc. 79-6). The FHWA inspection included checks on the trailer's "door" and "door cables." (See Doc. 79-6 at 2). Northeast mechanics "conducted supplemental inbound inspections" on the trailer 11 additional times between October 10, 2016, and February 4, 2017. (See Doc. 70 ¶ 6; Doc. 79-7 at 3, 4). Inbound inspections included ensuring "the cables and pins look good." (See Doc. 79-13, Schirra Dep. 13:1-14:9). None of these inspection records indicate cable issues. (See Doc. 79-7 at 3, 4). And on the day of the accident, Szentadorjany conducted a "pre-trip inspection" as

5

required under federal law. (See Doc. 70 ¶ 7). Szentadorjany did not notice "any fraying or excess wear" on trailer #2908 during that inspection. (See Doc. 70 ¶ 8; Doc. 77-6 at 1).

Two days after the incident, a Northeast mechanic at the Americold facility named Joseph Schirra repaired the trailer. (See Doc. 70 ¶ 24). Schirra's work order is dated February 6, 2017, and notes "left side door cable broken." (See Doc. 79-14). Lannak visited the shop that week and took photos of the cable. (See Lannak Dep. 109:18-110:10). However, he neglected to request that Northeast retain the cable. (See id. at 274:6-16). Thus, when Schirra replaced the cable, he did not preserve it, testifying that no one asked him to do so, and that replaced parts were generally put "in a barrel for scrap." (See Schirra Dep. 26:4-22, 30:23-31:2, 78:20-79:8). Wakefern's head of maintenance confirmed that saving replaced parts is "not a standard practice." (See Doc. 79-15, Turner Dep. 31:16-32:9). Wakefern does not use a schedule to replace the cable in a particular amount of time. (See id. at 45:19-46:5). Instead, cables are simply replaced if they snap, fray, or are otherwise damaged. (See id.) The cable in question had been in use from 2011 when Wakefern first took title to the trailer, until the day of Szentadorjany's accident. (See id. at 46:6-15).

C. **Accident Theories & Expert Reports**

The parties dispute the manner in which Szentadorjany's accident occurred, and have submitted competing testimony and expert reports as part of the summary judgment record. For his part, Szentadorjany testified that, when he exited the trailer, he saw the left cable "just hanging" and therefore believes "it did

6

not snap." (See Szentadorjany Dep. 88:18-89:16). Rather, he testified that Lannak informed him that the cotter key and clevis pin had somehow become dislodged, causing the left cable to lose its tension. (See id. at 265:21-267:8). Lannak's records from around the incident, on the other hand, characterize the cable as "broken" or "severed about 1 foot from the bottom." (See Doc. 90-8 at 1, 2). But under oath, Lannak stated that the left side "cotter pin was missing" and that "the clevis pin was angled up." (See Lannak Dep. 108:13-109:5, 126:12-128:5). Petrella submitted a written statement saying that there was a "snapped door cable." (See Doc. 90-11 at 1). He also testified at a hearing about Szentadorjany's workers' compensation claim, stating, "I saw that the cable was snapped on the left side." (See Doc. 77-4, Petrella Test. 35:23-36:5). Szentadorjany's employer opposed his workers' compensation claim, believing the February 2017 incident was a "fraudulent, staged event." (See Doc. 66-2 ¶ 33; Doc. 70 ¶ 32).

The Rule 56 record also contains competing expert reports. Szentadorjany obtained a report from Albert L. de Richemond. (See Doc. 90-13). He concludes, *inter alia*, that Szentadorjany could not have staged the incident and did not cause his own injuries; that Wakefern or Northeast's maintenance practices, or both, were inadequate and caused Szentadorjany's injuries; and that Whiting failed to effectively warn Szentadorjany about door safety. (See id. at 35-37). Wakefern and Whiting obtained an expert report from Timothy Joganich. (See Doc. 79-22). Joganich concludes the "incident could not and did not occur in the manner that [Szentadorjany] described in his sworn testimony," opines that it had been staged, and states that the door's warnings were "appropriate" to warn Szentadorjany.

7

(See id. at 21, 22). Wakefern, Whiting, and Northeast also received a report from Michael S. Connelly, who opines that Wakefern and Northeast met the standard of care for "trailer inspections and repair" under standards set by the Federal Motor Carrier Safety Administration, and Ironclad and Szentadorjany are to blame for the accident. (See Doc. 69-16 at 5-9).

### D.      Procedural History

In October 2018, Szentadorjany filed a four-count complaint against Wakefern, Whiting, and Wabash. The complaint alleges a negligence claim against Wakefern,[3] and products-liability claims against Whiting and Wabash. Wakefern crossclaims against Wabash and Whiting for contribution and indemnity. Wabash reciprocally crossclaims against Whiting and Wakefern for contribution and indemnity, and further asserts a contractual crossclaim against Whiting based on an indemnification agreement. Whiting asserts a crossclaim against Wakefern for contribution and indemnity.

The original defendants also added parties via third- and fourth-party pleading. Wakefern filed a third-party complaint against Northeast and Ironclad, invoking indemnification clauses in agreements with those respective entities. Whiting crossclaims against Northeast and Ironclad for contribution and indemnity. Northeast, in turn, crossclaims against all defendants for contribution and indemnity. Northeast also filed a fourth-party complaint against Lily, claiming Lily

---

[3] Szentadorjany initially asserted a products-liability claim against Wakefern, but he is no longer pursuing that claim. (See Doc. 79-3 at 2; see also Doc. 87 at 1 n.1).

8

was responsible for, and negligent in, training Ironclad drivers. Lily never answered Northeast's complaint. Although various defendants added claims and parties, Szentadorjany did not amend his complaint to assert claims against Northeast, Ironclad, or Lily.

## II.     Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## III.    Discussion

Wakefern, Whiting, and Wabash move for summary judgment regarding Szentadorjany's claims against them and any crossclaims against them. (See Doc.

9

66 at 10; Doc. 70 at 10; Doc. 74 at 4-5).[4]  Wabash also moves for partial summary judgment on its contractual crossclaim against Whiting.  (See Doc. 74 at 4-5).  Lily, asserting it has been improperly pled as third-party defendant Ironclad, moves for summary judgment on all claims against it.  (See Doc. 69).  Northeast concurs with Wakefern's motion for summary judgment and moves for summary judgment on Wakefern's derivative third-party claim against it.  (See Doc. 72).

### A.   Spoliation

Wakefern, Whiting, and Wabash argue that Szentadorjany should be sanctioned—through a grant of summary judgment in favor of defendants—for spoliation of evidence because the door cable at issue was discarded.  (See Doc. 66-1 at 10-15; Doc. 71 at 9-13; see also Doc. 75 at 2, 9 n.19).  Spoliation occurs when a party destroys, alters, fails to produce, or "fails to preserve evidence in instances where litigation is pending or reasonably foreseeable."  Bull v. UPS, 665 F.3d 68, 73 (3d Cir. 2012) (citations omitted).  To establish spoliation occurred, the party seeking sanctions must show that (1) the ostensibly spoliated evidence was in the

---

[4] Szentadorjany concurs in Wabash's motion "as long as it does not affect [his] claims against Whiting."  (See Doc. 74-1; Doc. 78 at 1).  He also did not file an opposition brief against Wabash.  We are mindful that, when considering an unopposed motion for summary judgment, the district court "still must find for itself that there is no genuine dispute of material fact and that the movant deserves judgment as a matter of law."  See United States v. Brace, 1 F.4th 137, 143 (3d Cir. 2021).  After reviewing Wabash's uncontested facts on this issue, (see Doc. 74-2 ¶¶ 1-16), we agree that "no party contends that [Wabash's] installation of the door system was improper," (see id. ¶ 5).  Indeed, the expert report upon which Szentadorjany bases much of his argument makes no mention of Wabash in its discussion or opinion sections.  (See Doc. 90-14 at 29-37).  We will grant Wabash's motion to the extent it seeks summary judgment on Szentadorjany's products-liability claim against it.

10

offending party's control, (2) "the evidence is relevant to the claims or defenses in the case," (3) the party with control of the evidence actually suppressed or withheld it, and (4) "the duty to preserve the evidence was reasonably foreseeable to th[at] party." Id. (citing Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995)). An unfavorable inference arises only when the spoliating party acted in bad faith, not when evidence "has been lost or accidentally destroyed." Id. at 79 (quoting Brewer, 72 F.3d at 334).

In the matter *sub judice*, we need not move beyond the first element—no evidence of record indicates that Szentadorjany was in control of the cable. Wakefern owned the trailer at issue, which housed the cable. (See Doc. 70 ¶ 3). Northeast controlled the repair process for Wakefern trailers and performed repairs on trailer #2908. (See id. ¶ 4; Doc. 79-7). Furthermore, Wakefern's head of maintenance testified that "We normally don't save parts that we replace. It's not a standard practice." (See Turner Dep. 32:2-3). Szentadorjany informed Ironclad of the accident as soon as it occurred, filled out an accident report, and then left the facility. (See Szentadorjany Dep. 108:7-23, 260:22-261:15). Put simply, no facts indicate Szentadorjany ever possessed or otherwise controlled the cable that was eventually discarded. Cf. Bull, 665 F.3d at 73.

Wakefern also argues that Szentadorany's employer "had three full days to take steps to preserve the cable and did nothing." (See Doc. 71 at 10). To the extent Lannak and Ironclad failed to timely notify Northeast that the cable might be needed for future litigation, Wakefern presents no evidence that this failure amounted to anything beyond negligence, or indeed, how Ironclad's failure could be

11

properly attributed to Szentadorjany. Contemporaneous reports and emails between Lannak and his superiors indicate they disbelieved Szentadorjany's version of events soon after the accident occurred. (See Doc. 79-12 at 3; Doc. 90-8). They sought to preserve the cable in anticipation of a workers' compensation claim, and simply were not successful in their endeavors. (See Doc. 79-12 at 3). We readily conclude that Szentadorjany did not spoliate evidence, and summary judgment is not warranted on this basis.

### B. Wakefern's & Whiting's Motions

Szentadorjany asserts one count of negligence against Wakefern, and one count of "products liability" against Whiting. Wakefern and Whiting both move for summary judgment on the issue of causation. As explained below, the same causation standard applies to both claims; we therefore address Wakefern's and Whiting's arguments together.

A plaintiff asserting negligence in Pennsylvania "must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage." See Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 61 (3d Cir. 2009) (quoting Phillips v. Cricket Lighters, 841 A.2d 1000, 1008 (Pa. 2003)). A plaintiff raising a products-liability claim in Pennsylvania must prove, *inter alia*, that the defect in a product caused his injury. See Phillips v. A-Best Prods. Co., 665 A.2d 1167, 1171 (Pa. 1995) (quoting Walton v. Avco Corp., 610 A.2d 454, 458 (Pa. 1992)). In either cause of action, a plaintiff must prove proximate cause. Proximate cause exists when the defendant's wrongful actions were a "substantial factor" in

causing the plaintiff's harm. Rost v. Ford Motor Co., 151 A.3d 1032, 1049 (Pa. 2016) (citations omitted). Pennsylvania courts "consistently and without exception [have] held that issues of causation are matters of fact for the jury to decide." Id. (products liability); see Hamil v. Bashline, 392 A.2d 1280, 1284-85 (Pa. 1978) (negligence); see also Sikkelee v. Precision Airmotive Corp., 907 F.3d 701, 715 (3d Cir. 2018) (district court should have allowed jury to decide causation on plaintiff's negligence and strict liability claims).

Wakefern and Whiting argue that the existence of several theories leading to Szentadorjany's injuries means that the jury must speculate about proximate cause, and therefore summary judgment is warranted. (See Doc. 71 at 5-9; Doc. 66-1 at 9-10). These arguments are unpersuasive. Szentadorjany need only establish that defendant's actions were a "substantial factor" in bringing about his injury. See Rost, 151 A.3d at 1049. He is not required to "exclude every possible explanation" to establish proximate cause. See Jones v. Montefiore Hosp., 431 A.2d 920, 923 (Pa. 1981). Nor is he required, at this stage, to conclusively disprove defendants' theories of the accident. Indeed, there are already three separate expert reports on record, all of which purport to explain the events of February 4, 2017, with reasonable degrees of professional certainty. (See Doc. 90-13 at 35; Doc. 69-16 at 2; Doc. 79-2 at 21). We conclude that material factual disputes exist on the issue of causation. Summary judgment is not warranted for Wakefern or Whiting.

### C. Lily's Motion on Northeast's Claims

Lily avers it has been improperly pled as two separate parties—Ironclad and Lily—and moves on behalf of both. (See Doc. 69). Lily seeks summary judgment on the claims asserted by Northeast against Ironclad and Lily. (See Doc. 69-1 at 5).[5]

Northeast asserts two claims against Ironclad and Lily: a crossclaim against Ironclad for contribution or indemnity, (see Doc. 38 at 9), and a fourth-party claim against Lily for "negligence/contribution," which avers Lily was responsible for training Ironclad employees like Szentadorjany, (see Doc. 52 ¶ 12). Northeast alleges Lily breached its duties by failing to adequately provide that training. (See id. ¶¶ 14-18).

Lily argues that any claims against it are precluded because Lily was Szentadorjany's employer, and the "exclusivity provision" of the Pennsylvania Workers' Compensation Act bars such claims. (See Doc. 69-1 at 20-22). The relevant section of the Act provides:

> (a) The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes . . .
> (b) In the event injury or death to an employe is caused by a third party, then such employe, his legal

---

[5] Lily also argues that the opinion of Michael Connelly is inadmissible as a "net opinion." (See Doc. 69-1 at 14-17). The court has issued an order that motions *in limine* to exclude expert testimony are not due until 30 days after resolution of summary judgment motions. (See Doc. 81). Lily's argument is therefore premature. We note, however, that Lily invokes New Jersey evidentiary doctrine in its briefing. See, e.g. Townsend v. Pierre, 110 A.3d 52, 62 (N.J. 2015) (noting that the "net opinion" rule is derived from New Jersey Rules of Evidence). In federal court, admissibility of expert testimony is governed by Federal Rule of Evidence 702. See FED. R. EVID. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-89 (1993).

14

> representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to receive damages by reason thereof, may bring their action at law against such third party, but the employer, his insurance carrier, their servants and agents, employes, representatives acting on their behalf or at their request shall not be liable to a third party for damages, contribution, or indemnity in any action at law, or otherwise, unless liability for such damages, contributions or indemnity shall be expressly provided for in a written contract entered into by the party alleged to be liable prior to the date of the occurrence which gave rise to the action.

See 77 PA. STAT. AND CONS. STAT. ANN. § 481.

Northeast opposes Lily's motion, arguing that there is a genuine factual dispute about who employed Szentadorjany at the time of the incident. (See Doc. 85 at 3-8). At this juncture, we agree. No answer to Northeast's fourth-party complaint was ever filed on the docket, by Lily or Ironclad. Nor did Lily file a corporate disclosure statement pursuant to Federal Rule of Civil Procedure 7.1, although all five other defendants did—including Ironclad. (See Docs. 2, 7, 13, 32, 47). Instead, Lily's first filing is its instant motion for summary judgment. (See Doc. 69).

Furthermore, as Northeast correctly points out, the record contains inconsistent evidence about which entity employed Szentadorjany. For his part, Szentadorjany believed that Ironclad was Lily's "union shop." (See Szentadorjany Dep. 163:10-21). Lily's corporate deponent stated that "Lily and Ironclad are essentially the same" but have different Department of Transportation numbers. (See Doc. 69-11, Crowley Dep. 28:9-21). Lily also provides a "payment history report" for Szentadorjany's workers' compensation claim, listing "Lily

15

Transportation Corp." as the relevant employer. (See Doc. 69-13 at 2). Yet certain paperwork in Szentadorjany's file lists his employer as "Ironclad Logistics." (See Doc. 84-4 at 5-13, 44-46, 53-58, 92-95). Additionally, a workers' compensation hearing transcript lists "LTL, Incorporated AKA Iron Clad Logistics" as Szentadorjany's employer. (See Doc. 77-4 at 1). Lily provides no supplementary documentation or explanation for "LTL, Incorporated," nor does Lily provide any corporate documentation for its relationship to Ironclad. Given the conflicting evidence of record, we consider the identity of Szentadorjany's employer to be a material dispute of fact. As Lily's preclusion argument assumes Lily was Szentadorjany's employer, we will deny this portion of Lily's motion for summary judgment.

### D.     Motions on Contractual Indemnity

Three parties seek summary judgment on contractual indemnity claims. Wabash seeks partial summary judgment on its crossclaim against Whiting. (See Doc. 75 at 17-19). Lily seeks summary judgment on Wakefern's third-party complaint against Ironclad. (See Doc. 69-1 at 11-13). Northeast seeks summary judgment on Wakefern's third-party claim against it. (See Doc. 73 at 15-16). All parties base their motions on contractual indemnification clauses and argue that because the terms of these clauses are unambiguous, they are entitled to judgment as a matter of law. We will deny these motions as premature.

In Pennsylvania, "indemnity is a common law remedy which shifts the entire loss from one who has been compelled, by reason of some legal obligation, to pay a judgment occasioned by the initial negligence of another who should bear it." See

16

Willet v. Pa. Med. Catastrophe Loss Fund, 702 A.2d 850, 854 (Pa. 1997) (citing Builder's Supply Co. v. McCabe, 77 A.2d 368, 370 (Pa. 1951)). The right to indemnity is contingent upon a judgment or settlement. See McClure v. Deerland Corp., 585 A.2d 19, 23 (Pa. Super. Ct. 1991). Thus, a party who seeks indemnification before this contingency has been fulfilled has acted prematurely. See Oblon v. Ludlow-Fourth Corp., 595 A.2d 62, 69 (Pa. Super. Ct. 1991); McClure, 585 A.2d at 22.

### 1. *Wabash's Crossclaim Against Whiting*

Wabash's motion as to Whiting highlights a contract between the two parties obligating Whiting to "indemnify, assume the defense of, and hold harmless" Wabash in certain suits brought by third parties. (See Doc. 74-21 at 2-3). Wabash concludes that "if Whiting is found liable to [Szentadorjany,] Wabash is entitled to defense and indemnity by Whiting." (See Doc. 75 at 19-20). Whiting opposes this motion, arguing that Wabash's motion is premature. (See Doc. 83-2 at 1-3). We agree with Whiting. Wabash's motion is clearly predicated on a finding of liability against Whiting; its brief notes several times that Wabash is entitled to defense and indemnity *in the event that* Whiting is found liable. (See Doc. 75 at 5, 7, 9, 21, 23, 24). Whiting's liability to Szentadorjany has not been adjudicated, and Wabash's motion is premature. See McClure, 585 A.2d at 22. We will deny this portion of Wabash's motion without prejudice to its right to reraise its motion at the appropriate time.

### 2. *Wakefern's Third-Party Claim Against Ironclad*

Wakefern's third-party claim against Ironclad is predicated on a "carriage transportation" contract between Ironclad and nonparty Americold "for the provision of dedicated motor carrier services." (See Doc. 69-8 at 2). Wakefern is

17

named in that contract as a third-party client of Americold. (See id.) This contract includes an agreement that Ironclad will "defend, indemnify[,] and hold Americold and [Wakefern] harmless" from claims relating to Ironclad or its employees, unless the claim is "attributable to the negligence or willful misconduct of Americold or [Wakefern]." (See id. at 7).

Lily, on behalf of Ironclad, argues that because the indemnification clause specifically exempts suits arising from, *inter alia*, the "negligence" of Wakefern, Wakefern cannot prevail on its claim.[6] (See Doc. 69-1 at 11-13). To the extent Lily argues it cannot be required to indemnify Wakefern for *Wakefern's* own negligence, we agree—as does Wakefern. (See Doc. 69-5). The indemnification clause does not require Ironclad to indemnify Wakefern in the event of Wakefern's negligence vis-à-vis Szentadorjany. Ironclad may, however, be held liable to indemnify Wakefern for whatever portion of Szentadorjany's injury is attributable to Ironclad's actions or omissions. (See Doc. 69-8 at 2). There are genuine disputes concerning causation on the underlying negligence claim between Szentadorjany and Wakefern, and thus genuine disputes as to whether and how apportionment of liability on the indemnification agreement is appropriate, if at all. Lily's motion is premature, see McClure, 585 A.2d at 22, and we will deny Lily's motion to the extent it seeks

---

[6] Lily further argues that, assuming Lily's negligence caused Szentadorjany's accident, nothing in the contract requires Lily "to defend or indemnify Wakefern for injury to a Lily employee." (See Doc. 69-1 at 13). As we have already discussed, the identity of Szentadorjany's employer is a disputed material fact, and Lily's argument on this basis also fails.

dismissal of Wakefern's third-party complaint without prejudice to its right to reraise its motion at the appropriate time.

### 3. *Wakefern's Third-Party Claim Against Northeast*

Wakefern's third-party complaint against Northeast is also predicated on a contractual indemnification clause in a repair and maintenance agreement between Wakefern and Northeast. (See Doc. 79-5). Northeast agreed to indemnify Wakefern for "all losses" in connection with Northeast's repair services, with an exception for claims "caused by the proven negligence or willful misconduct of" Wakefern. (See id. ¶ 10). Northeast seeks summary judgment as a third-party defendant, noting that Szentadorjany never filed a claim against it, and arguing that any legal duty it has to "repair, maintain and inspect is limited to the obligations under the contract with Wakefern." (See Doc. 73 at 15-16).[7] Much like the Wabash and Lily motions on indemnification, Northeast's motion is premature. See McClure, 585 A.2d at 22. Wakefern's claim against Northeast, which requests contribution and indemnification, therefore survives because liability has not yet been decided vis-à-vis Wakefern. We will deny Northeast's motion without prejudice to its right to reraise its motion at the appropriate time.

---

[7] No other defendant opposed Northeast's motion, but Szentadorjany filed an answer to the statement of facts as well as a brief in opposition. (See Docs. 93, 94). Northeast replied, arguing that Szentadorjany lacks standing to contest the motion because he has no direct claim against Northeast. (See Doc. 96). Szentadorjany expressly disclaims a theory of direct liability in his responsive brief and admits he has no claim against Northeast. (See Doc. 94 at 7). Thus, the only theories of liability against Northeast are through Wakefern's third-party claim or through other defendants' crossclaims.

## IV.   Conclusion

We will grant in part and deny in part defendants' motions (Docs. 66, 69, 70, 72, 74) for summary judgment.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   August 20, 2021